IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 6:24-cr-03132-MDH-1 |
| | ) | |
| WEST PHARRIS FORD, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

Pending before the Court is Defendant West Pharris Ford's Motion to Suppress. (Doc. 39). The Government has filed its suggestions in opposition. (Doc. 41). Mr. Ford has not filed a reply and the time to do so has passed. The Court held a hearing on this matter on December 18, 2025. (Doc. 44). The issue is now ripe for consideration. For the reasons that follow, it is recommended that the motion be DENIED.

### I. Findings of Fact

Based on the evidence presented at the hearing, the Court submits the following proposed findings of fact:

1. On November 16, 2022, a narcotics detective with the Springfield Police Department ("SPD") contacted patrolling officer Eric Dye and shared that he suspected a passenger vehicle would be transporting narcotics in the area. The narcotics detective directed Officer Dye to initiate a traffic stop if he observed any traffic violation. (Tr. 4:16-5:14).

2. At approximately 2:00 a.m., Officer Dye observed a white Pontiac G6 bearing Missouri license plates TE7HOH traveling at about 45 mph in a 60 mph zone. Officer Dye also

noticed the vehicle's driver side tires repeatedly touching or crossing the dotted white roadway lines. (Doc. 39 at 1-2; Tr. 5:15-19; Tr. 14:21-23).

3. Officer Dye conducted a computer check of the license plate and learned it was registered to a Mercury passenger vehicle. (Doc. 39 at 2; Doc. 41 at 1; Tr. 20:1-7). Officer Dye suspected the driver was impaired and noting the license plate violation, initiated a traffic stop. (Doc. 41 at 1; Tr. 5:20-24).

4. West Pharris Ford was the driver of the vehicle. Mr. Ford informed Officer Dye that he was delivering the vehicle from St. Louis to a car dealership in Springfield. He stated he did not know the name of the dealership and was unaware of the mismatched license plate, as the vehicle did not belong to him. (Doc. 41 at 2; Tr. 6:2-18).

5. Mr. Ford showed Officer Dye the GPS route on his phone, which indicated a destination of 1510 North Glenstone Avenue, Springfield, Missouri. (Tr. 6:19-23). Mr. Ford stated he did not have identification because he had left his wallet at a bank but verbally provided Officer Dye with his identifying information. (Doc. 41 at 2).

6. Based on his prior knowledge, Officer Dye knew that 1510 North Glenstone Avenue corresponded to a Casey's gas station rather than a car dealership. (Doc. 41 at 2).

7. Officer Dye ran Mr. Ford's information through his computer system. He learned that Mr. Ford had a suspended driver's license. Officer Dye asked Mr. Ford to step out of the vehicle. (Doc. 41 at 2; Tr. 20:24-25).

8. When he emerged from the vehicle, Mr. Ford was hunched over. He told Officer Dye his hunched posture was due to a previous gunshot wound to his back. (Doc. 41 at 2). Mr. Ford asked to use the restroom, but Officer Dye informed him that he would need to wait until the investigation was complete. (Doc. 41 at 2).

9. Officer Dye conducted a frisk of Mr. Ford to check for weapons. He did not locate any illicit items. Officer Dye then asked for permission to search the vehicle, which Mr. Ford granted. (Doc. 41 at 2; Tr. 7:1-23).

10. Officer Dye retrieved his Police Service Dog ("PSD"), Ivan from the patrol vehicle and commanded him to begin a search of the car. Ivan is trained to detect methamphetamine, heroin, marijuana, and cocaine. Ivan alerted to the presence of narcotics in a dark canvas bag located on the front passenger floorboard. (Doc. 41 at 2; Tr. 8:2-10).

11. Officer Dye located a black digital scale with a white powdery residue inside the canvas bag. Based on his training and experience, the substance was consistent with a controlled substance. (Tr. 8:11-20). Officer Dye did not find any additional drug-related contraband inside the vehicle. (Doc. 41 at 2-3). After completing the vehicle search, Officer Dye contacted the narcotics detective, who was communicating with a confidential informant in real time. The confidential informant advised that if the drugs were not located under the hood of the vehicle, they would be on Mr. Ford's person. (Doc. 41 at 2-3; Tr. 9:1-5).

12. Officer Dye returned to Mr. Ford and asked if he still needed to use the restroom. Mr. Ford said yes. Officer Dye told Mr. Ford he would need to check him one more time before he could use the restroom. Officer Dye instructed Mr. Ford to face the patrol vehicle and spread his legs apart, and Mr. Ford complied. (Doc. 41 at 3; Tr. 9:19-23).

13. Officer Dye felt a bulge near Mr. Ford's groin area that he believed to be a foreign object. (Tr. 10:1-11). Officer Dye instructed Mr. Ford to turn around and face him. Officer Dye lifted Mr. Ford's shirt and observed the top of a plastic bag tucked into his waistband behind the belt buckle. Mr. Ford attempted to pull his shirt back down. (Doc. 41 at 3; Tr. 10:13-23).

14. Officer Dye informed Mr. Ford that he was going to detain him until he could determine what was on his person. (Tr. 10:24-11:3). Officer Dye placed a handcuff on Mr. Ford's left wrist. Before the second handcuff could be applied, Mr. Ford attempted to pull away. Officer Dye's backup officer assisted with apprehending Mr. Ford and placing him in handcuffs. (Doc. 41 at 3; Tr. 11:4-9).

15. A search of Mr. Ford, incident to arrest, revealed several plastic bags concealed in his underwear. (Doc. 41 at 3; Tr. 11:13-15).

16. The bags contained thirty green round pills, five grams of a white powdery substance, thirty grams of a white powdery substance, which field tested positive for cocaine, thirty-two grams of white powdery substance, which field tested positive for cocaine, and sixty-four grams of a white powdery substance, which field tested positive for fentanyl. (Doc. 41 at 3-4). Two cell phones were also seized from the vehicle and taken into evidence.

17. Mr. Ford was transported to Greene County Jail. (Doc. 41 at 4).

## II. Discussion

On December 10, 2024, a federal grand jury in the Western District of Missouri indicted Mr. Ford for knowingly and intentionally possessing, with the intent to distribute, 40 grams or more of a mixture or substance containing a detectable amount of N-phenyl-N-[1-(2-phenylethyl-4-piperidinyl] propenamide (fentanyl), a Schedule II controlled substance, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B), and knowingly and intentionally possessing, with the intent to distribute, a mixture or substance containing a detectable amount of cocaine, a Schedule II controlled substance, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C). On November 14, 2025, Mr. Ford filed the instant motion seeking suppression of all evidence obtained, observations made, and statements taken from Mr. Ford as a result of the November 16, 2022, search. (Doc. 39 at 11-12). The motion challenges the

constitutionality of the traffic stop and search of Mr. Ford's person, arguing that it violated his rights under the Fourth and Fourteenth Amendments to the United States Constitution.

### A. Legal Standard

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. The Fourth Amendment is enforceable against the states through the Fourteenth Amendment. *Metro Omaha Prop. Owners Ass'n, Inc. v. City of Omaha*, 991 F.3d 880, 884 (8th Cir. 2021) (citing *Camara v. Mun. Ct. of City & Cty. of San Francisco*, 387 U.S. 523, 528 (1967)). Traffic stops are a type of seizure and therefore must be reasonable. *United States v. Sanchez*, 955 F.3d 669, 674 (8th Cir. 2020); *see United States v. Martinez*, 358 F.3d 1005, 1009 (8th Cir. 2004). "[A] traffic stop is reasonable if it is supported by either probable cause or an articulable and reasonable suspicion that a traffic violation has occurred." *United States v. Williams*, 39 F.4th 1034, 1041 (8th Cir. 2022) (quoting *United States v. Walker*, 840 F.3d 477, 483 (8th Cir. 2016)). "Any traffic violation, however minor, provides probable cause for a traffic stop." *United States v. Hanel*, 993 F.3d 540, 543 (8th Cir. 2021) (quoting *United States v. Bloomfield*, 40 F.3d 910, 915 (8th Cir. 1994)). Objectively reasonable mistakes of law or fact may still justify a valid stop. *United States v. Walker*, 840 F.3d 477, 483 (8th Cir. 2016). Once an officer has probable cause for the stop, it is immaterial if the stop is merely pretext for another investigation. *See United States v. Frasher*, 632 F.3d 450, 453 (8th Cir. 2011).

Under the Fourth Amendment, citizens have the right to "be free from unreasonable governmental intrusion" on to their persons. *Terry v. Ohio*, 392 U.S. 1, 9 (1968). During a valid stop, officers may conduct a pat-down search for weapons to ensure officer safety if they have objectively reasonable suspicion that a person might be armed and dangerous. *United States v. Stokes*, 62 F.4th 1104, 1108-09 (8th Cir. 2023). In considering whether reasonable suspicion exists, the court shall

consider the totality of circumstances in light of the officer's experience and specialized training. *United States v. Preston*, 685 F.3d 685, 689 (8th Cir. 2012) (citing *United States v. Davis*, 457 F.3d 817, 822 (8th Cir. 2006)).

If the police fail to abide by the Fourth Amendment, the exclusionary rule, a judicially prescribed remedial measure, "forbids the use of improperly obtained evidence at trial." *Martinez Carcamo v. Holder*, 713 F.3d 916, 922 (8th Cir. 2013) (quotation omitted). The exclusionary rule extends to "evidence later discovered and found to be derivative of an illegality or 'fruit of a poisonous tree.'" *United States v. Tuton*, 893, F.3d 562, 568 (8th Cir. 2018). For there to be "fruit," there must first be a "poisonous tree," that is, "an illegal search or seizure" or "an illegality." *United States v. Finley*, 56 F.4th 1159, 1166 (8th Cir. 2023) (internal citations omitted).

### B. Officer Dye had probable cause to conduct a traffic stop.

Mr. Ford argues that the traffic stop was pretextual and that Officer Dye lacked probable cause or reasonable suspicion to justify the stop of his vehicle. (Doc. 39 at 4-7). The Government contends that Officer Dye had authority to stop Mr. Ford after discovering that the license plates attached to the Pontiac G6 he was driving was registered to a different vehicle. (Doc. 41 at 5-7). In the alternative, the Government argues that Officer Dye had probable cause to conduct a traffic stop when he saw the vehicle veering over the highway divider lines. (*Id.*). The Court recommends that the District Judge find that Officer Dye had probable cause to conduct a traffic stop.

"To comply with the Fourth Amendment, a traffic stop must be supported by probable cause or reasonable suspicion." *United States v. Moua*, 145 F.4th 929, 933 (8th Cir. 2025) (citing *United States v. Linnell*, 93 F. 4th 1102, 1105 (8th Cir. 2024)). Courts apply an objective reasonableness standard to determine whether a traffic stop was based on probable cause or was merely pretextual. *United States v. Mallari*, 334 F.3d 765, 766 (8th Cir. 2003). "An officer is justified in stopping a

motorist when the officer 'objectively has a reasonable basis for believing that the driver has breached a traffic law.'" *Id.* at 766-67 (quoting *United States v. Thomas*, 93 F.3d 479, 485 (8th Cir. 1996). Subjective intent is not determinative in deciding whether the stop was reasonable. *See Whren v. United States*, 517 U.S. 806, 813 (1996).

Missouri law requires all vehicles operated on Missouri highways to be registered. Mo. Rev. Stat. § 301.020.1. When a motor vehicle is registered, the Director of Revenue issues license plates unique to each registration. § 301.030. License plates must be attached to the vehicle that corresponds with their registration. §§ 301.130.5, 301.320. In Springfield, where Mr. Ford was stopped, failure to display a proper license plate is a violation of Springfield Code of Ordinances. Code of Ordinances Sec. 106-10. "Any traffic violation, however minor, provides probable cause for a traffic stop." *Hanel*, 993 F.3d at 543. Under Missouri law, an officer has probable cause to detain a driver who operates a vehicle displaying license plates registered to another vehicle. *State v. Reed*, 157 S.W.3d 353, 357 (Mo. Ct. App. 2005).

Officer Dye testified that he ran the plates on the Pontiac G6 and determined they were registered to a Mercury vehicle. (Tr. 5:15-19, 20:1-7). He stopped Mr. Ford because the license plates on the vehicle he was driving were registered to another vehicle. (Tr. 5:20-24). This alone provides probable cause for the traffic stop. *See* Mo. Rev. Stat. §§ 301.130.5, 301.320 (license plates must be attached to the vehicle that corresponds with their registration); *Hanel*, 993 F.3d at 543 ("Any traffic violation, however minor, provides probable cause for a traffic stop."). Further, when Officer Dye ran Mr. Ford's information, he discovered that Mr. Ford was operating the vehicle with a suspended license. Driving with a suspended license is an additional traffic violation. Mo. Rev. Stat. § 302.321; Springfield Code of Ordinances Sec. 106-9. Officer Dye had probable cause to conduct the traffic

stop and to instruct Mr. Ford to exit the vehicle based on the inconsistent license plates and suspended driver's license.

Even if Officer Dye lacked probable cause to stop Mr. Ford's vehicle based on the license plate violation, the traffic stop was lawful because Officer Dye had reasonable suspicion that Mr. Ford was impaired. *Moua*, 145 F.4th at 934; *Mallari*, 334 F.3d at 767; *see Navarette v. California*, 572 U.S. 393, 402 (2014) (recognizing that weaving on the roadway is a common sign of intoxication). Officer Dye saw Mr. Ford's car repeatedly touch or cross the white dotted roadway dividing lines and observed Mr. Ford was driving 45 mph in a 60 mph zone at 2:00 in the morning. (Doc. 41 at 1). These observations provided Officer Dye with reasonable suspicion that the driver was impaired by drug or alcohol use. *United States v. Behrens*, No. 24-2543, 2025 WL 2103088, at *2 (8th Cir. July 28, 2025) (finding an officer observing a vehicle driving at inconsistent speeds, including ten miles per hour below the speed limit, was sufficient to establish reasonable suspicion that a driver was impaired).

Mr. Ford further argues that the court must scrutinize an officer's credibility in cases where the stop may have been pretextual. (Doc. 39 at 6). At the evidentiary hearing, Mr. Ford alleged Officer Dye was not credible because he was not truly waiting to conduct a breathalyzer test on Mr. Ford and he submitted an allegedly incomplete report. (Tr. 35:3-11; 36:9-11). However, an officer's subjective intent to initiate a traffic stop is irrelevant once probable cause is established. *United States v. Fuehrer*, 844 F.3d 767, 772 (8th Cir. 2016). As explained above, Officer Dye had probable cause to stop Mr. Ford for a traffic violation. Mr. Ford's bare assertion that the stop was pretextual is unsupported by fact or controlling case law.

Accordingly, this Court recommends the District Judge find that the initiation of the traffic stop did not violate the Fourth Amendment.

    **C. The traffic stop was not unreasonably prolonged.**

Mr. Ford argues next that the traffic stop was unreasonably prolonged and constituted an unreasonable seizure. (Doc. 39 at 7-11). The Government argues the stop was not unreasonably long because Mr. Ford consented to the vehicle search, the search was completed within five minutes of the initial stop, and the results of the search created independent reason for Officer Dye to continue his investigation. (Doc. 41 at 7-10). The Court recommends that the District Judge find that the traffic stop was not unreasonably prolonged.

A traffic stop constitutes a seizure and therefore "must be supported by reasonable suspicion or probable cause." *Behrens*, 2025 WL 2103088, at *2 (quoting *United States v. Houston*, 548 F.3d 1151, 1153 (8th Cir. 2008)). Stops "exceeding the time needed to handle the matter for which the stop was made" generally violate "the Constitution's shield against unreasonable seizures." *Moua*, 154 F.4th at 935 (quoting *Rodriguez v. United States*, 575 US. 348, 350 (2015)). "Once an officer finishes the tasks associated with a traffic stop, it is unreasonable to further detain the vehicle's occupants unless something occurs during the stop to generate reasonable suspicion to justify the further detention." *Id.* (quoting *United States v. Austin*, 104 F.4th 695, 699 (8th Cir. 2024)).

"[T]here is no *per se* time limit on all traffic stops." *Moua*, 154 F.4th at 935 (internal citations omitted). "An officer need only act diligently to pursue the mission of the stop. An officer's mission may evolve during the stop, as when the officer develops 'reasonable suspicion of drug-related activity during the routine traffic-stop tasks.'" *Id.* "To have reasonable suspicion, a police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant further investigation." *United States v. Allen*, 43 F.4th 901, 907-08 (8th Cir. 2022). "The Court reviews the totality of the circumstances to determine if an officer had reasonable suspicion to extend a traffic stop." *Id.* at 908.

After learning that Mr. Ford was driving with a suspended license, Officer Dye asked him to exit the vehicle. (Doc. 41 at 2). When Mr. Ford exited the vehicle hunched over, Officer Dye conducted a search of Mr. Ford's person to check for weapons. (*Id.*); *see Austin*, 104 F.4th at 699 (permitting officers to conduct a protective pat-down search for weapons during a traffic stop). Mr. Ford then gave Officer Dye permission to search the vehicle. (Doc. 41 at 2); *see Moua*, 154 F.4th at 935 ("When a motorist gives consent to search his vehicle, he necessarily consents to an extension of the traffic stop."). Ivan, Officer Dye's PSD, was already in the cruiser, and Officer Dye retrieved the dog immediately upon receiving consent to search the car for drugs. (Doc. 41 at 2). During the search, Ivan alerted to the presence of narcotics. (*Id.*). Taken together, these factors justify prolonging the traffic stop. *Allen*, 43 F.4th at 908. Nothing about the stop indicates an unreasonable delay.

Even if the stop took longer than five minutes, Officer Dye had reasonable suspicion to continue the traffic stop. "An officer's suspicion of criminal activity may reasonably grow over the course of a traffic stop as the circumstances unfold and more suspicious facts are uncovered." *United Stats v. Magallon*, 984 F.3d 1263, 1278 (8th Cir. 2021) (internal citations omitted). "The suspicious facts must be specific and articulable facts which, taken together with rational inferences from these facts, amount to reasonable suspicion that further investigation is warranted." *Id.* (internal citations omitted). Officer Dye knew the license plates attached to Mr. Ford's Pontiac G6 were registered to a Mercury vehicle. He knew Mr. Ford was driving with a suspended license, did not own the vehicle, and claimed to be traveling to a used car dealership that he could not name, located at an address that Officer Dye knew to be a Casey's gas station. *See United States v. Sanchez*, 955 F.3d 669, 675 (8th Cir. 2020) ("A reasonable officer could find it inherently suspicious that someone would lend their truck to unlicensed drivers. . . ."); *United States v. Pacheco*, 996 F.3d 508, 512 (8th Cir. 2021) (noting a defendant's "odd" answers to questions about routine travel plans contributed to officer's reasonable

suspicion of criminal activity to extend traffic stop). Finally, before the traffic stop concluded, Officer Dye learned that Mr. Ford might have drugs on his person. (Tr. 25:17-25). The facts Officer Dye learned throughout the traffic stop warranted extending the stop to conduct further investigation into potential drug activity.

Mr. Ford relies on *Rodriguez v. United States* for the proposition that conducting a dog sniff search during a traffic stop unreasonably prolongs the stop. (Doc. 39 at 10-11). This argument fails for two reasons. First, unlike in *Rodriguez*, Mr. Ford consented to the search. *See Rodriguez*, 575 U.S. at 352. Second, the question before the Court in *Rodriguez* was "whether police routinely may extend an otherwise-completed traffic stop, *absent reasonable suspicion*, in order to conduct a dog sniff." *Id.* at 353 (emphasis added). *Rodriguez* addressed dog sniffs following completed traffic stops where the officer has no reasonable suspicion that the driver is impaired or other criminal activity is afoot. Here, Officer Dye had reasonable suspicion that Mr. Ford might be impaired. The stop's purpose was to investigate both the license plate violation and whether Mr. Ford was driving impaired. Mr. Ford consented to the search of the car. During the traffic stop, Officer Dye communicated by phone with another officer and learned that Mr. Ford may have drugs on his person. *See United States v. Robinson*, 664 F.3d 701, 703 (8th Cir. 2011) ("When multiple officers are involved in an investigation, probable cause may be based on their collective knowledge and need not be based solely on the information within the knowledge of the arresting officer as long as there is some degree of communication."). Officer Dye had sufficient reasonable suspicion to extend the stop beyond checking the license plate. Thus, Mr. Ford's reliance on *Rodriguez* is misplaced.

Accordingly, this Court recommends that the District Judge find that the traffic stop was not unreasonably prolonged.

### D. Officer Dye developed independent probable cause to arrest Mr. Ford when Mr. Ford resisted being placed in handcuffs.

The Government argues in the alternative that Mr. Ford's resistance to being detained in handcuffs attenuated any alleged Fourth Amendment violation. (Doc. 41 at 11-14). Mr. Ford did not file a reply brief and therefore did not address this argument. The Court recommends that the District Judge find that Officer Dye had independent grounds to arrest and search Mr. Ford based on Mr. Ford's resistance.

"[R]esistance to an illegal arrest can furnish grounds for a second, legitimate arrest." *United States v. Sledge*, 460 F.3d 963, 966 (8th Cir. 2006); *see United States v. Dawdy*, 46 F.3d 1427, 1431 (8th Cir. 1995) (holding "a defendant's response to even an invalid arrest . . . may constitute independent grounds for arrest."). Mr. Ford forfeited any Fourth Amendment protection by resisting arrest when he attempted to flee as Officer Dye was handcuffing him. When he attempted to flee, Mr. Ford created probable cause for his arrest on the charge of resisting arrest. *See* Mo. Rev. Stat. § 575.150.1(1) ("A person commits the crime of resisting arrest if the person reasonably should know an officer is making an arrest or a lawful stop or detention, and the person "[r]esists the arrest, stop or detention . . . by fleeing from such officer."). Mr. Ford was being handcuffed when he began to resist arrest. He had prior contacts with the criminal justice system. Officer Dye testified that Mr. Ford attempted to pull away before a second handcuff could be placed on his wrist. (Tr. 11:4-9). Mr. Ford had to be taken to the ground by two officers in order to be handcuffed. (*Id.*). Thus, by resisting, Mr. Ford committed a new, distinct crime, thereby permitting Officer Dye to lawfully arrest him and search his person incident to arrest. *See Sledge*, 460 F.3d at 968.

Because probable cause supported Mr. Ford's arrest, the subsequent search of his person did not violate the Fourth Amendment. *See United States v. Blackmon*, 662 F.3d 981 (8th Cir. 2011) (referencing *United States v. Robinson*, 414 U.S. 218, 235 (1973)). Accordingly, this Court

recommends that the District Judge find the search of Mr. Ford's person did not violate the Fourth Amendment.

E. Suppression of Mr. Ford's statements is improper.

Mr. Ford seeks suppression of "all statements allegedly taken from the Defendant and others . . . ." (Doc. 39 at 12). The Government argues that Mr. Ford's statement should not be suppressed because questions asked of a motorist temporarily detained during a traffic stop do not require suppression. (Doc. 41 at 14); *see Berkemer v. McCarty*, 468 U.S. 420, 439-40 (1984). The Court recommends that the District Court find Mr. Ford's statements should not be suppressed.

"Persons detained temporarily pursuant to ordinary traffic stops are not 'in custody' for the purposes of *Miranda*. . . . [A] traveler in a traffic stop is temporarily deprived of freedom of action, but he is not typically subjected to a degree of restraint that is associated with formal arrest. *Miranda* warnings are thus not required." *United States v. Villaneuva*, 116 F.4th 813, 820 (8th Cir. 2024) (referencing *Miranda v. Arizona*, 348 U.S. 436 (1966)) (internal citations omitted). The only statements Mr. Ford allegedly made occurred during the traffic stop. Officer Dye was not required to give Mr. Ford *Miranda* warnings until he was arrested. *Id*. Mr. Ford's briefing does not identify any statements made after his arrest. Therefore, the Court must assume that Mr. Ford seeks suppression of statements made during the traffic stop. Eighth Circuit precedent forecloses this argument. Accordingly, the Court recommends that the District Judge find Mr. Ford's statements should not be suppressed.

### III. Conclusion

For the foregoing reasons, IT IS RECOMMENDED that the District Judge, after making an independent review of the record and applicable law, enter an order DENYING Defendant West Pharris Ford's Motion to Suppress. (Doc. 39).

Counsel are reminded that each party has fourteen (14) days from the date of receipt of a copy of this Report and Recommendation within which to file and serve objections. A failure to file and serve objections by this date shall bar an attack on appeal of the factual findings in the Report and Recommendation that are accepted or adopted by the District Judge, except on the grounds of plain error or manifest injustice.

Dates this 23rd day of December, 2025, at Jefferson City, Missouri.

*Willie J. Epps, Jr.*

Willie J. Epps, Jr.
Chief United States Magistrate Judge